UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JON HENRI BRYANT, SR., <br><br> Movant, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Respondent. | 4:20-CV-04068-KES <br><br><br> REPORT AND RECOMMENDATION |

**INTRODUCTION**

This matter is pending before the court on the motion by movant Jon Henri Bryant, Sr. seeking to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. <u>See</u> Docket No. 1.[1] The United States of America ("government") has filed a motion to dismiss, arguing that, on the basis of the pleadings alone, Mr. Bryant cannot establish an entitlement to relief and his motion should be denied without holding an evidentiary hearing. <u>See</u> Docket No. 13. This matter was referred to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, United States District Judge.

---

[1] Documents filed in Mr. Bryant's § 2255 matter are referenced by docket number only. Documents cited from Mr. Bryant's underlying criminal matter, <u>United States v. Bryant</u>, 4:16-cr-40125 (D.S.D.), are refernced by the docket number preceded by "CR."

## FACTS

### A.    Pretrial Proceedings

On November 9, 2016, Mr. Bryant was indicted for car jacking in violation of 18 U.S.C. § 2119(2).  See CR Docket No. 1.  He appeared in federal court pursuant to a writ of habeas corpus ad prosequendum from state custody on November 22, 2016.  See CR Docket Nos. 6 & 8.  Attorney Jason Tupman of the Federal Public Defender's Office was appointed to represent Mr. Bryant at this time and, at the conclusion of the hearing, he was returned to state custody.  See CR Docket Nos. 10-11.  A not guilty plea was entered on Mr. Bryant's behalf.  See CR Docket No. 8.

On December 6, 2016, the government obtained a superseding indictment against Mr. Bryant which included the original car jacking charge and added two new counts for kidnapping, in violation of 18 U.S.C. § 1201(a)(1), and interstate domestic violence, in violation of 18 U.S.C. § 2261(a)(2).  See CR Docket No. 18.  Mr. Bryant waived his personal appearance on the superseding indictment and entered not guilty pleas to the new charges through his lawyer.  See CR Docket No. 24.

On January 17, 2017, the state released Mr. Bryant and he came into federal custody, where he consented to his detention by the United States Marshals.  See CR Docket No. 29.  On April 10, 2017, counsel for Mr. Bryant moved to have him placed on pretrial release.  See CR Docket No. 33.  A hearing was held and the court denied the motion based on risk of danger to the community.  See CR Docket Nos. 36-37.

On the heels of the failed bond motion, counsel moved to withdraw from representing Mr. Bryant, citing a complete breakdown in the attorney-client relationship, and Mr. Bryant filed his own motion seeking new counsel.  See CR Docket Nos. 38 & 40.  The court granted the motions and appointed attorney James Eirinberg in place of the Federal Public Defender to represent Mr. Bryant.  See CR Docket Nos. 39.

## B.    Petition to Plead Guilty

On July 31, 2017, Mr. Bryant filed a petition to plead guilty to the kidnapping charge and a supporting statement of facts.  See CR Docket Nos. 57-58.  Mr. Bryant stated in the petition that he understood the government had the right to continue to prosecute him for car jacking and for interstate domestic violence.  See CR Docket No. 57.

The factual basis statement recited that, on October 25, 2016, Mr. Bryant had slapped his girlfriend and forced her through threat of force to get into the trunk of an automobile.  See CR Docket No. 58.  Mr. Bryant then drove the automobile with his girlfriend in the trunk from South Dakota to a rural area in Minnesota where he stopped.  Id.  He allowed the girlfriend to get out of the trunk at this point and sit in the front passenger seat.  Id.  Mr. Bryant told the woman to call 911 "back."[2]  Id.  When law enforcement officers arrived at the scene, Mr. Bryant became angry and attempted unsuccessfully to flee the area.  Id.

---

[2] Because the statement inserts the word "back," the court infers the woman had dialed 911 previously.  Thus, if Mr. Bryant was instructing her to call 911 "back," perhaps he was directing her to cancel her original call for assistance.

**C.    Change of Plea Hearing**

Mr. Bryant appeared before the district court on August 1, 2017, to enter a plea of guilty to kidnapping pursuant to his petition to plead guilty.  See CR Docket No. 60.  At the beginning of the hearing, he was placed under oath.  See CR Docket No. 107 at p. 2.  He testified under oath that he was sixty-one years old, had completed high school, one year of college, and three technical school programs.  Id. at p. 3.

The court inquired whether Mr. Bryant had "recently" been treated for any mental illness.  Id.  He responded "not recently."  Id.  The court made no further inquiry as to when Mr. Bryant may have received mental health treatment or for what.  Id.  Mr. Bryant told the court he was not then under the influence of any drug, medication or alcohol.  Id.

Mr. Bryant told the court he was fully satisfied with the advice and representation he had received up to that point from Mr. Eirinberg.  Id. at p. 4. Mr. Bryant denied that anyone had made any promises or threats to try to make him plead guilty.  Id.  He stated he was pleading guilty of his own free will because he was guilty.  Id. at p. 5.

The government did not promise to dismiss the other two counts in return for Mr. Bryant's guilty plea to kidnapping, but it did state that it intended to dismiss the other two counts without prejudice after Mr. Bryant's sentencing.  Id.

The court informed Mr. Bryant that the crime of kidnapping was a felony and, if he pleaded guilty, he would lose valuable civil rights such as the right to

4

vote, possess firearms, serve on a jury, and hold public office. Id. Mr. Bryant stated that he understood. Id. at p. 6. The court informed Mr. Bryant that, if he pleaded guilty, he was subject to a maximum sentence of up to life imprisonment and a $250,000 fine, as well as five years' supervised release, up to five more years' imprisonment if supervised release was revoked, a $100 assessment to the victim's assistance fund, and restitution. Id. at p. 7. Mr. Bryant stated he understood the maximum penalties. Id.

The court explained it would calculate Mr. Bryant's sentencing range under the United States Sentencing Guidelines ("USSG"), but that the USSG range was advisory only and the court could sentence him above or below the USSG range. Id. at p. 8.

The court explained Mr. Bryant and the government could both appeal if either felt the court had made a mistake. Id. at p. 9. The court explained there is no parole in federal court, only a limited right to earn good time credit, so Mr. Bryant would have to serve the entirety of any sentence he received. Id. Mr. Bryant stated that he understood. Id.

The court explained Mr. Bryant had a right to persist in his not guilty plea and to have a jury trial. Id. The court told Mr. Bryant that, at his trial, she would tell the jury Mr. Bryant was presumed innocent and it was the government's burden to prove his guilt beyond a reasonable doubt. Id. The court told Mr. Bryant that he had a right to be represented by counsel and that counsel would be appointed to represent him if he could not afford to hire a lawyer. Id.

The court told Mr. Bryant that, at trial, he would have a right to see and hear all the witnesses that testified and he could have them cross-examined on his behalf. Id. at p. 10. If Mr. Bryant wanted to call witnesses to testify, the court told him he could use the court's subpoena power to compel their attendance. Id.

The court told Mr. Bryant he could testify on his own behalf or he could decide not to testify. Id. If Mr. Bryant chose not to testify or not to put on any evidence, the court told Mr. Bryant she would instruct the jury that they were not to use those facts against him and that the burden remained on the government to prove its case beyond a reasonable doubt. Id.

The court informed Mr. Bryant that, if he entered a plea of guilty, he would be giving up his right to a trial and all his other rights. Id. Mr. Bryant stated he understood. Id. The court explained each essential element of the crime of kidnapping that the government would have to prove if he availed himself of his right to a trial. Id. at pp. 10-11. Mr. Bryant stated he understood the government would have to prove these facts in order to prevail at trial. Id. at p. 11.

The court asked Mr. Bryant whether he had read the factual basis statement and he indicated he had. Id. Mr. Bryant told the court the facts asserted in the statement were the truth. Id. The court asked Mr. Bryant why he slapped his girlfriend in the face and made her get in the trunk of the automobile. Id. at p. 12. Mr. Bryant explained he wanted to take her someplace private to talk to her. Id. Mr. Bryant explained he forced his

girlfriend to get into the trunk in Sioux Falls, South Dakota, then drove with

her in the trunk over to Minnesota.  Id.  He clarified that he then drove back to

a farm near Garretson, South Dakota, where he stopped and was apprehended.

Id. at pp. 12-13.  With these clarifications, the court found the factual basis

supported the plea.  Id. at p. 13. Mr. Bryant then entered a plea of guilty to the

charge of kidnapping.  Id.

> The court accepted his plea as follows:
>
> It is the finding of the Court in the case of United States v. Jon
> Henri Bryant, Sr., that the Defendant is fully competent and
> capable of making an informed plea, that he is aware of the nature
> of the charges and the consequences of the plea, and that the plea
> of guilty is a knowing and voluntary plea supported by an
> independent basis in fact containing each of the essential elements
> of the offense.  The plea is, therefore, accepted, and the defendant
> is now adjudged guilty of that offense.

Id. at pp. 13-14.

### D.    PSR, Pre-Sentencing Motions and Submissions

Following Mr. Bryant's plea, a presentence investigative report ("PSR")

was written.  See CR Docket No. 75.  The PSR calculated Mr. Bryant's advisory

USSG range to be 360 months to life imprisonment by applying the base

offense level ("BOL") for attempted murder instead of the BOL for kidnapping.

Id. at p. 16, ¶ 79.

Mr. Bryant told the PSR author that he was in "a good state of mental

health." Id. at p. 15, ¶ 69.  He said he has struggled with depression and had

attempted suicide several times.  Id.  He was hospitalized for two days after his

attempted suicide in 2007.  Id.  He had also attempted suicide in 1983 and

1984.  Id.  He told the PSR author that he had been depressed at the time of

the kidnapping in this case. Id. He requested that a mental health condition be included as part of his sentence as he believed he would benefit from receiving counseling and medication. Id. Although it is typical for a convicted defendant to sign an authorization to obtain medical records, there is nothing in the PSR to suggest that its author obtained Mr. Bryant's medical records or mental health records.

The PSR contained an accounting of Mr. Bryant's criminal history, which included a serious abduction and domestic assault/kidnapping in 1983. Id. at p. 11, ¶ 42. This prior crime involved threatening the victim with a gun, keeping her locked up in a closet over a two-day period, attempted strangling of her, and attempted suffocation with a pillow over her face. Id. Mr. Bryant's criminal history also included a history of assault and violating a protection order. Id. at pp. 8-10.

Counsel for Mr. Bryant filed multiple objections to the PSR. See CR Docket No. 71. He asserted many objections to the PSR's recitation of the facts of the offense, minimizing Mr. Bryant's conduct. Id. For example, he asserted he slapped the victim rather than punched, never threatened to kill her, placed his hands around her neck but did not strangle her, she did not pass out or experience difficulty breathing, he only went across the state line because the interstate exit he wanted to take was closed, etc. Id.

Counsel also objected to the application of the BOL for attempted murder and instead advocated for the kidnapping BOL of 32. Id. He objected to increasing the BOL based on the victim sustaining substantial bodily injury,

8

asserting that the victim sustained no such injury.  Id.  He objected to increasing the BOL for reckless endangerment during flight, arguing that the victim was not in danger of harm while Mr. Bryant attempted to flee across a plowed field.  Id.  Counsel argued that Mr. Bryant should receive three points downward adjustment in the BOL due to acceptance of responsibility instead of only two.  Id.

Counsel also asserted numerous objections to the criminal history recited in the PSR, adding asserted facts of clarification or denial to the characteristics of these other crimes.  Id.  Finally, counsel supplemented paragraph 65 of the PSR by stating how well Mr. Bryant did in the Buddy Program of the United States Army.  Id.  Counsel asserted Mr. Bryant's total offense level under the USSG should be 29, rather than the 41 contained in the PSR.  Id.  This would have yielded a USSG range of 97-121 months' imprisonment.  Id.  See also CR Docket No. 78 at p. 2.

Counsel filed a motion for downward departure from the USSG range arguing, among other things, that Mr. Bryant suffered from severe mental and emotional problems.  CR Docket No. 78. at pp. 3-4.  Counsel acknowledged that Mr. Bryant told the PSR officer he was in a good state of mental health, but counsel disagreed.  Id. at p. 4.  Counsel asserted Mr. Bryant had suffered from severe depression since 1983 and had attempted suicide several times.  Id.  Counsel asserted that it was his belief Mr. Bryant was suffering from severe mental conditions during the pretrial portion of this litigation.  Id.  Counsel also asserted jail staff did not provide Mr. Bryant with the mental health

medications he needed.  Id.  No medical records or expert opinions were submitted to support these assertions by counsel.

Counsel collected and submitted six letters of support from friends, relatives, girlfriends, and Mr. Bryant's mother who all stated the crime was not in Mr. Bryant's character.  See CR Docket Nos. 73-74 & 84.  None of these support letters mention a history of mental illness or depression.  Id.

In addition, Mr. Bryant submitted a written allocution statement prior to sentencing.  See CR Docket No. 72.  In that statement, Mr. Bryant attacked the victim as a liar whose word could not be trusted.  Id. at pp. 1-2.  He complained that his lawyer knew the victim had committed perjury and was not bringing it to the court's attention.  Id. at p. 2.

He also accused the police officer who described seeing Mr. Bryant straddling the victim hitting her with his fists of being a liar.  Id.  Mr. Bryant asserted that, when the police arrived at the rural location where Mr. Bryant had stopped the car, the victim was sitting in the front seat smoking a cigarette and drinking a soda while Mr. Bryant was talking on his cell phone with his neighbor.  Id.

Mr. Bryant suggested some of the photos of the victim were doctored or not taken on the day of the incident because the victim "didn't have [her teeth] in" during the incident, while she "had in her teeth" in some of the photos.  Id.  He suggested the blood on the victim's white tee-shirt was not from his actions because the victim had a hoodie on over the top of her tee-shirt while Mr. Bryant was abducting her.  Id. at p. 3.

10

**E.    Sentencing Hearing**

At the sentencing hearing, Mr. Bryant's counsel withdrew the previously-asserted objections numbered 1, 2, 19-22.  See CR Docket No. 100 at pp. 4-5. The government then put on evidence to address Mr. Bryant's remaining objections.

The first witness was the police dispatch employee who received the victim's 911 call on the day of the incident.  Id. at pp. 6, 8.  The recording of the victim's 911 call from the trunk of the car was introduced and played through this witness.  Id. at pp. 8-16.  This included statements from the victim that she was being placed in the trunk of the car and that she did not want to die.  Id.  The witness explained that Mr. Bryant took the victim's phone from her just a few minutes after the 911 call was made.  Id.  Thereafter, law enforcement was able to ping Mr. Bryant's phone and locate him and the victim on a farm near Garretson, South Dakota.  Id.

Next, the government called Sioux Falls Police Officer Robert Forster.  Id. at p. 17.  Officer Forster was one of the police officers who attempted to locate Mr. Bryant based on the victim's 911 call.  Id. at pp. 17-19.  Based on pings of Mr. Bryant's phone which located that phone on Interstate 90 ("I-90"), Officer Forster traveled from Cleveland Avenue in Sioux Falls onto I-229 north, then onto I-90 east, traveling at speeds of 100-120 miles per hour.  Id. at pp. 19-20. A map was introduced through Officer Forster that showed the route he traveled that day in pursuit of Mr. Bryant leading east on I-90 into Minnesota, then onto Minnesota state highway 23, then onto Minnesota state highway 11,

which then turned into 258th Street on the South Dakota side, onto 488th Avenue, then onto 257th Street and ending at a farm near Garretson.  Id. at 20-23.

Officer Forster testified that, the entire time he was pursuing Mr. Bryant in his patrol vehicle, he had his lights and siren on.  Id. at p. 37.  Officer Forster testified that, when Mr. Bryant stopped at the farm, officers parked their vehicles at the road, blocking the driveway.  Id. at pp. 23-27.  Thus blocked in, Mr. Bryant attempted to flee by driving into a plowed soy bean field at a high rate of speed—40 to 60 miles per hour the officer estimated.  Id.  Mr. Bryant disabled his vehicle and was then apprehended.  Id.

Next, the government called Sioux Falls Police Sergeant Tim Hagen.  Id. at p. 38.  Sergeant Hagen was involved in pursuing Mr. Bryant's vehicle across the plowed field.  Id. at pp. 38-44.  He described coming upon Mr. Bryant after his car stopped in the middle of a field.  Id.  At first, Mr. Bryant was outside the car with the driver's side door open.  Id.  Sergeant Hagen then saw Mr. Bryant reenter the car and go over to the passenger side and begin assaulting the victim by either punching her or stabbing her.  Id.  Sergeant Hagen and others were shouting commands at Mr. Bryant, but he was not obeying those commands.  Id. at pp. 44-45.  Mr. Bryant then fled again in the car, ending up on a gravel road where other officers were able to halt his vehicle.  Id. at p. 45.  While other officers were taking Mr. Bryant into custody, Sergeant Hagen went to the victim, who was laying on the ground outside the passenger side of the car.  Id. at pp. 45-46.  She had some blood on her and was sobbing hysterically

12

and crying and screaming.  Id.  Sergeant Hagen stated he saw a roll of duct tape in the vicinity.  Id.

The government's next witness was Sioux Falls Police Sergeant Tom Ward.  Id. at p. 54.  Sergeant Ward described pursuing Mr. Bryant across plowed fields at speeds of up to 50-60 miles per hour.  Id. at pp. 55-56. Sergeant Ward testified to seeing Mr. Bryant throwing 4 or 5 haymaker punches at the victim while he, Sergeant Hagen and another officer approached the vehicle as it was stopped in the field.  Id. at p. 57.  Sergeant Ward testified he initially thought Mr. Bryant was stabbing the victim and it was only later he discovered he had been punching her instead.  Id. at p. 58.  After other officers had secured Mr. Bryant on the ground, Sergeant Ward handcuffed him  Id. at pp. 59-60.  Sergeant Ward observed a brand new roll of electrical black tape and a brand new roll of duct tape near the victim on the ground on the passenger side of the vehicle.  Id. at p. 60.  He observed the victim to be crying, bleeding, and to have a red and swollen face.  Id.

The next government witness was Sioux Falls Police Detective John Carda.  Id. at p. 71.  Detective Carda interviewed Mr. Bryant after his arrest. Id. at pp. 71-73.  Mr. Bryant told Detective Carda that he had wanted to talk to the victim about her new boyfriend and wanted to take the victim away somewhere private so that neighbors would not hear them possibly yelling and screaming at each other.  Id.  Detective Carda listened to some of Mr. Bryant's recorded phone calls from the jail and testified Mr. Bryant had admitted in a phone call to his mother that he had placed the victim in the trunk and that he

13

had later strangled her until he saw her eyes roll back in her head.  Id. at

pp. 73-75.

Detective Carda interviewed the victim on the day of the incident.  Id. at

pp. 76-77.  He described her physical appearance as including an abrasion to

the side of her neck, a bruise on her chin, and a cut on her lip.  Id.  She told

Detective Carda her neck and body were hurting.  Id.  Detective Carda also

observed some petechiae in one of her eyes, which he later explained are small

pinpoints of blood from broken blood vessels, which can be caused by

strangulation.  Id.

The victim told Detective Carda that she had begun dating a new

boyfriend about three weeks before the incident with Mr. Bryant.  Her car

window was smashed after she began this new relationship and she did not

report the vandalism to the police.  When Mr. Bryant later told her he learned

of the vandalism through the police log, the victim suspected Mr. Bryant had in

fact vandalized her car because it was never reported in the police log.  Around

the same time, all four tires on her boyfriend's vehicle were punctured.

Also, in the week or so before the incident, the victim's daughter's car

quit working.  Mr. Bryant repaired it, and it subsequently quit working again.

Upon looking at the area repaired, the victim believed Mr. Bryant had undid

the repair he previously performed in order to have further contact with the

victim.  In fact, Mr. Bryant had arranged to come repair the daughter's car

again on the day of the incident.  When Mr. Bryant interviewed with Detective

14

Carda, he admitted he had been following the victim for a month prior to the incident, including unwelcome visits at her place of work.

The victim told Detective Carda that, on the day of the incident, she had arrived back home after taking her two daughters to school and found her garage door up and her garage door would not close with the remote control. She got out of her car to manually close the garage door and encountered Mr. Bryant, who had unplugged the garage door opener.

The victim said Mr. Bryant had been contacting her through social media, stating he wanted to talk to her, but she did not want to talk to him. Mr. Bryant emerged from the garage with an unusual look in his eye, bear hugged the victim, and told her he wanted to talk to her. She stated she did not want to talk to him. Mr. Bryant did not release the victim from the hug, but instead carried her into the garage where he punched her in the mouth.

Mr. Bryant demanded the victim's car keys from her, which she surrendered. He then left the garage and told the victim if she left, he would kill her. Mr. Bryant then got into the victim's car and pulled it into the garage, got out and opened the trunk of the car and began rummaging around inside the trunk. While Mr. Bryant was absent, the victim dialed 911 on her cell phone and then placed the phone into her purse.

The victim asked what Mr. Bryant was doing, and Mr. Bryant replied he was going to put her into the trunk. The victim stated Mr. Bryant told her he was going to kill her. He then put her into the trunk and began driving. At

some point, Mr. Bryant stopped, opened the trunk and took the victim's cell phone from her.

When the car stopped again, Mr. Bryant let the victim out of the trunk and put her in the front seat.  He assaulted her again at this time, to include strangulation to the point the victim lost consciousness.  The victim described being in an unfamiliar farm setting.  She also noticed two new rolls of duct tape in the front seat that had not been in her car previously.  The victim stated that Mr. Bryant told her he was upset about her new boyfriend, upset with her lack of communication with Mr. Bryant, and that he was going to kill her.

Both Mr. Bryant and the victim saw police approaching their car. According to the victim, Mr. Bryant announced neither she nor he were going to get out of this situation and he was going to ensure she died along with him. Mr. Bryant took off driving across a plowed field and, after further pursuit, ended up being cornered by police vehicles on a gravel road.

Dr. Kenneth Snell, Coroner for Minnehaha County, also testified that the physical bruising, petechiae, and redness shown on the victim's face and neck in photographs was consistent with being punched and strangled.  Id. at pp. 112, 118,  Dr. Snell testified that if the victim was strangled until she lost consciousness, the strangulation presented a substantial risk of the victim's death.

Counsel for Mr. Bryant presented testimony from a person who had been a co-worker of the victim and a co-worker and friend of Mr. Bryant.  The witness testified that the victim was an inveterate liar.  Another witness

presented for the defense testified that the victim and Mr. Bryant were dating long after the victim had said their relationship ended.  Both witnesses did the same type of auto body work that Mr. Bryant did and both testified they routinely use duct tape in their work.

The district court found the evidence persuasive that Mr. Bryant strangled the victim until she lost consciousness, thereby justifying the application of the attempted-murder USSG.  The USSG range remained, at the end of the sentencing hearing, exactly as it was suggested in the PSR:  360 months to life imprisonment.  The court imposed a sentence of 360 months.

Counsel for Mr. Bryant briefly touched on his mental status, but did not elaborate, did not present medical records, and did not have any expert opinion presented.  The government brushed off Mr. Bryant's mental health history as "dated," stating it had occurred over a decade prior to the incident in this case. The court briefly touched on Mr. Bryant's mental health history, but stated the sentence imposed was appropriate because of his long history of abusing women including five separate women who obtained protection orders against Mr. Bryant and the prior abduction charge from the 1980s.

## F.    Appeal

Mr. Bryant appealed his conviction to the Eighth Circuit.  He argued the district court had erred in applying the attempted murder USSG BOL instead of applying the BOL for kidnapping.  See CR Docket No. 129.  The court affirmed, noting that the facts and the law supported application of the BOL for attempted murder.  Id.  Mr. Bryant also argued, unsuccessfully, that the

district court engaged in double-counting by applying the attempted murder BOL and then applying an upward adjustment for the victim having sustained a life-threatening injury. <u>Id.</u> The Eighth Circuit rejected this argument too, noting that the evidence needed to support each USSG provision was distinct. <u>Id.</u> Finally, the court reviewed Mr. Bryant's sentence for substantive reasonableness and found it was reasonable. <u>Id.</u>

## G.    Mr. Bryant's § 2255 motion

Mr. Bryant timely filed his motion to vacate, correct or set aside his conviction pursuant to 28 U.S.C. § 2255. In his motion, he alleges his counsel was ineffective for failing to investigate Mr. Bryant's mental health history, failing to consider an insanity defense, failing to ask for a competency evaluation, and failing to call witnesses who would have established Mr. Bryant was not acting like himself at the time of the kidnapping. <u>See</u> Docket No. 1.

The government now moves to dismiss Mr. Bryant's § 2255 motion without holding an evidentiary hearing, arguing that Mr. Bryant's claims of ineffective assistance of counsel are precluded by his plea of guilty. They are not, as the court explains in further detail below.

## DISCUSSION

## A.    Scope and Procedure Applicable to a § 2255 Motion

Section 2255 of Title 28 of the United States Code was enacted to supersede habeas corpus practice for federal prisoners. <u>Davis v. United States</u>, 417 U.S. 333, 343-44 (1974). Section "2255 was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." <u>Id.</u> at 343.

18

Prior to the enactment of § 2255, habeas claims had to be brought in the district where the prisoner was confined, resulting in overburdening those districts where federal correctional institutions were located and presenting logistical issues because the record in the underlying criminal case were often in a distant location.  United States v. Hayman, 342 U.S. 205, 212-16 (1952). The enactment of § 2255 resolved these issues by requiring that the motion be filed in the sentencing court.  Id.

The scope of a § 2255 motion is seemingly broader than the scope of a habeas petition, the latter of which is typically limited to allegations of a constitutional dimension.  Section 2255 allows a federal prisoner to "vacate, set aside or correct" a federal sentence on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  See 28 U.S.C. § 2255.

Where the allegation for relief is *not* based on a violation of a Constitutional or federal statutory right or an assertion that the court was without jurisdiction, the Supreme Court has read a "fundamentality" requirement into § 2255—relief is available for only those errors which constitute a "fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure."  Hill v. United States, 368 U.S. 424, 428 (1962); see Peguero v. United States, 526 U.S. 23, 27-30 (1999).

Generally, petitioners are precluded from asserting claims pursuant to § 2255 that they failed to raise on direct appeal. United States v. Frady, 456 U.S. 152, 167-68 (1982); McNeal v. United States, 249 F.3d 747, 749 (8th Cir. 2001). When a § 2255 petitioner asserts a claim that is procedurally defaulted because it was not raised on direct appeal, the claim can only proceed after the petitioner has shown either: (1) actual innocence or (2) that the procedural default should be excused because there was both cause for the default and actual prejudice to the petitioner. Bousley v. United States, 523 U.S. 614, 621-22 (1998); McNeal, 249 F.3d at 749. Therefore, barring a claim of actual innocence, a petitioner must show both cause for why he failed to raise an issue on direct appeal as well as actual prejudice caused by the alleged errors.

Appellate courts generally refuse to review claims of ineffective assistance of counsel on direct appeal; such claims are, therefore, properly addressed in a 28 U.S.C. § 2255 motion such as the one here. See United States v. Campbell, 764 F.3d 880, 892-93 (8th Cir. 2014); United States v. Lee, 374 F.3d 637, 654 (8th Cir. 2004) (ineffective assistance of counsel claims are not generally cognizable on direct appeal and will be heard only to prevent a miscarriage of justice or in cases where the district court has developed a record on the issue). Therefore, no procedural default analysis applies to petitioner's claim of constitutionally deficient counsel.

**B.     Standard Applicable to Rule 12(b)(6) Motions**

The government's motion to dismiss Mr. Bryant's § 2255 motion is based on Federal Rule of Civil Procedure 12(b)(6). See Docket No. 13. The Federal

Rules of Civil Procedure are applicable to § 2255 habeas actions so long as the procedural rules do not conflict with the habeas statutes or the Rules Governing Section 2255 Cases in the United States District Courts ("Governing Rules"). See Governing Rule 12. Federal Rule of Civil Procedure 12(b)(6) is not inconsistent with the Governing Rules. Compare Governing Rules 4 & 5 (allowing respondent to respond to petitioner's habeas petition with a motion), with FED. R. CIV. P. 12(b)(6) (same); see also Ebert v. Clarke, 320 F. Supp. 2d 902, 909-10 (D. Neb. 2004) (holding that FED. R. CIV. P. 12(b)(6) applies in habeas proceedings).

Rule 12(b)(6), that provision allows dismissal of a habeas petition if the petitioner has failed to state a claim upon which relief can be granted. See FED. R. CIV. P. 12(b)(6). Petitioners must plead "enough facts to state a claim to relief that is *plausible* on its face." Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (emphasis added).

Under Federal Rule of Civil Procedure 8(a)(2), a petitioner must plead only "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. at 555 (quoting FED. R. CIV. P. 8(a)(2)). A habeas petition does not need "detailed factual allegations" to survive a motion to dismiss, but a petitioner must provide the grounds for his entitlement to relief and cannot merely recite the elements of his cause of action. Id. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). There is also a "plausibility standard" which "requires a [petition] with enough factual matter (taken as true)" to support the conclusion that the petitioner has a valid claim. Id. at 556. The petitioner's

complaint must contain sufficiently specific factual allegations in order to cross the line between "possibility" and "plausibility" of entitlement to relief.  Id.

There are two "working principles" that apply to Rule 12(b)(6) motions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  First, courts are not required to accept as true legal conclusions "couched as factual allegation[s]" contained in a petition.  Id. (quoting Twombly, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (citing Twombly, 550 U.S. at 555).  Rule 8 "does not unlock the doors of discovery for a [petitioner] armed with nothing more than conclusions."  Id. at 678-79.

Second, the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679 (citing decision below Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007)).  Where the petitioner's allegations are merely conclusory, the court may not infer more than the mere possibility of misconduct, and the petitioner has alleged—but has not "show[n]"—that he is entitled to relief as required by Rule 8(a)(2).  Iqbal, 556 U.S. at 679 (emphasis added).

The Court explained that a reviewing court should begin by identifying statements in the petition that are conclusory and therefore not entitled to the presumption of truth.  Id. at 679-80.  Legal conclusions must be supported by factual allegations demonstrating the grounds for a petitioner's entitlement to relief.  Id. at 679; Twombly, 550 U.S. at 555; FED. R. CIV. P. 8(a)(2).  A court should assume the truth only of "well-pleaded factual allegations," and then

may proceed to determine whether the allegations "plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.  These are the principles guiding the court's evaluation of respondent's motion.

Rule 12(b)(6) requires the court to evaluate the sufficiency of a petitioner's pleading of a claim by examining his or her petition.  See FED. R. CIV. P. 12(b)(6); Iqbal, 556 U.S. at 679.  Courts evaluating a Rule 12(b)(6) motion are not strictly limited to evaluating the petition alone, however. Dittmer Properties, L.P. v. F.D.I.C., 708 F.3d 1011, 1021 (8th Cir. 2013).  They may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." Id. (quoting Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRACTICE & PROCEDURE § 1357 (3d ed. 2004))).

When a respondent files a response to a § 2255 action, whether it be an answer or a motion to dismiss, the respondent is directed to attach any transcripts or other records the respondent considers to be relevant and which are not available in the court's records.  See Governing Rule 5(c).  In addition, Rule 4 specifically directs the court to examine the record of prior proceedings in that court.  See Governing Rule 4(b).  The government has not supplied the court with any affidavits from Mr. Bryant's former trial counsel addressing Mr. Bryant's allegations of ineffective assistance claims.

Of necessity, then, evaluation of the government's motion limits the court to considering the entire record in Mr. Bryant's underlying criminal case, the medical documents Mr. Bryant has supplied himself (see Docket No. 2-1), and the law.  Because these documents are required by Governing Rule 5(c), and because these documents are of the type which the court would be allowed to judicially notice, the court considers these documents in ruling on respondents' Rule 12(b)(6) motion.  Dittmer Properties, L.P., 708 F.3d at 1021; FED. R. EVID. 201(b); Governing Rule 5(c).

## C.    Effect of Mr. Bryant's Plea on Claims He is Allowed to Bring Herein

The government argues that, because Mr. Bryant entered a guilty plea, all the claims he is now trying to raise are precluded because of that plea.  The court disagrees because Mr. Bryant's claims implicate the validity of the plea itself and because some of his claims involve post-plea allegations.

When a § 2255 petitioner has been convicted in his direct criminal proceedings by entering a guilty plea, the scope of issues available to him to be raised in habeas proceedings is curtailed.  As the Supreme Court has stated:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process.  When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.  He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in [McMann v. Richardson, 397 U.S. 759 (1970)].
>
> A guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional [issue] he might have to the charge, no

24

> matter how peripheral such [an issue] might be to the normal
> focus of counsel's inquiry.  And just as it is not sufficient for the
> criminal defendant seeking to set aside such a plea to show that
> his counsel in retrospect may not have correctly appraised the
> constitutional significance of certain historical facts, . . ., it is
> likewise not sufficient that he show that if counsel had pursued a
> certain factual inquiry such a pursuit would have uncovered a
> possible constitutional infirmity in the proceedings.

Tollett v. Henderson, 411 U.S. 258, 267 (1973).

The Supreme Court has explained why a guilty plea cuts off all constitutional claims that predate a plea.  Pleas are necessarily based on imperfect knowledge of the law and facts—one can only know what the result of a full-blown jury trial will be after the trial has been had, and even then, truth is still often in dispute.  McMann, 397 U.S. at 769-70.  If a defendant admits his commission of a crime, upon good faith, reasonably competent advice from his counsel, the defendant assumes the risk that his attorney might be wrong about the facts or the outcome of a legal issue.  Id. at 774.

The issue presented in habeas proceedings is not whether—in retrospect--counsel was right or wrong about a certain fact or legal analysis, but rather, whether the defendant's plea was made voluntarily and intelligently and upon advice from his attorney that was "within the range of competence demanded of attorneys in criminal cases."  Id. at 770-71.  Therefore, a defendant who pleaded guilty because of a prior coerced confession that he believed would be used against him at trial is not entitled to an evidentiary hearing in a habeas proceeding without showing other, extenuating circumstances.  Id. at 771.

A voluntary and knowing plea is not transformed into a coerced plea simply because the defendant pleaded guilty to obtain a lesser sentence than the maximum possible penalty that would have been applicable if defendant had been convicted at trial.  Brady v. North Carolina, 397 U.S. 742, 751 (1970); Parker v. North Carolina, 397 U.S. 790, 795 (1970).  Guilty pleas are valid if the court record affirmatively shows the plea was both voluntary and intelligent.  Boykin v. Alabama, 395 U.S. 238, 242 (1969).

A plea is voluntary if it is made by a defendant who is "fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel," and so long as the plea was not induced by threats, misrepresentation, or by promises that are improper, unfulfilled, or unfulfillable.  Brady, 397 U.S. at 755.

A plea is intelligently made if the defendant was aware of the nature of the charge against him, and he was mentally competent and in control of his mental faculties.  Id. at 756.  A plea is not rendered unintelligently made simply because, long after the plea was entered, the defendant realizes his cost-benefit analysis as to whether to go to trial or to plead guilty did not correctly take into account every relevant factor which entered into his decision.  Id. at 756-57.

Where a habeas petitioner collaterally attacks his plea by arguing that counsel was ineffective in advising petitioner to plead guilty, the petitioner must show not only that his counsel's performance was deficient; he must also show that he was prejudiced by counsel's substandard advice.  Hill v.

26

Lockhart, 474 U.S. 52, 58-59 (1985) (citing Strickland v. Washington, 466 U.S. 668 (1984)).  In the context of a guilty plea, in order for a habeas petitioner to demonstrate prejudice under Strickland, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill, 474 U.S. at 59.

Where the allegation of ineffectiveness centers on a "failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the [petitioner] by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea."  Id.  "This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial."  Id.  "[T]hese predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the 'idiosyncrasies of the particular decisionmaker.' "  Id. at 59-60 (quoting Strickland, 466 U.S. at 695).

All of Mr. Bryant's claims of ineffectiveness of counsel center on his mental illness and his lawyer's failure to investigate with regard to that issue and to use the evidence discovered to argue competency, insanity, and mitigation.  Obviously, had counsel obtained a competency evaluation of Mr. Bryant and the evaluation showed he did not understand the court processes or was unable to assist in his defense, Mr. Bryant's plea could potentially have been invalid.  Because we do not have any affidavits from Jason Tupman or James Eirinberg, the court does not know to what extent

27

there were facts which should have alerted these lawyers to obtain a competency evaluation or whether they considered and rejected such an avenue.  One cannot chalk a lawyer's inaction up to "trial strategy" absent some indication from the lawyer that that is what informed his actions.

We do know from the record that Mr. Eirinberg made observations that all was not right with his client as he, briefly, said as much at the sentencing hearing and in his written motion for a downward departure.  Also, Mr. Eirinberg stated he attempted to obtain Mr. Bryant's Veteran's Administration medical records, but was unsuccessful.[3]  See CR Docket No. 108 at p. 211.  But so far as the record demonstrates in this § 2255 proceeding, we have no indication that counsel sought records from other sources such as Avera McKennan Behavioral Health and the jail where Mr. Bryant was detained pretrial, both of which sources Mr. Bryant drew on to present records herein.  See Docket No. 2-1.  Inexplicably, counsel seemed reticent in the extreme to talk about Mr. Bryant's mental health at his sentencing, stating "it's hard to" to talk about.

Whether those records would have led to a competency evaluation or an insanity defense is not known—again, without an affidavit from counsel, the court is left to guess whether counsel considered these avenues.  The evidence, if obtained, could certainly have had the potential to impact sentencing.  Although Mr. Bryant was sentenced at the bottom of his USSG range, his

---

[3] Mr. Bryant suffered from glaucoma and other physical medical conditions.  It is unclear whether counsel attempted to obtain only these records, or whether he attempted to also obtain VA mental health records.

counsel had made a motion for a downward departure based on both his physical and mental conditions.  The government lawyer gave short shrift to this argument, stating that Mr. Bryant's history of mental illness was over a decade old.

But, had defense counsel obtained the same records Mr. Bryant did herein, those records would have shown Mr. Bryant's mental illness was ongoing at the time his criminal case was pending.  It was not some artifact of Mr. Bryant's life from long ago.  Perhaps if these records had been obtained and submitted to the court, the motion for downward departure may have merited further consideration.

The evidence submitted by Mr. Bryant sheds light on him and his actions in a number of relevant ways.  First, each of the severe mental breaks his records document took place temporally in proximity to some major criminal act of Mr. Bryant's.  His first documented mental break happened at the same time as the abduction he committed in the early 1980s.  His second documented mental break happened in 1993 after he was convicted of possession of 10 pounds of marijuana.  Another mental break occurred in 2007 after Mr. Bryant had been charged with violation of a protective order and possession of less than two ounces of marijuana.  And the records from the jail during Mr. Bryant's pretrial detention in this case demonstrate a third mental break had occurred or was occurring at the time of the kidnapping.  See Docket No. 2-1.

One can look at this history in one of two ways.  One can adopt the view posited by Mr. Bryant that his mental breaks occasioned his crimes or played some part in his commission of the crimes.  Or one can adopt a more cynical view and assume that Mr. Bryant tried to assert mental illness as a shield every time he got in serious trouble with the law.  However, with the 1993 mental break, Mr. Bryant voluntarily turned himself in at the emergency room after experiencing homicidal and suicidal ideations; at this time, Mr. Bryant had served all but four days of his work release sentence.  At least in 1993, the mental break cannot be said to have been asserted as a shield to prosecution because, at the time Mr. Bryant recognized he was in danger, he had already been convicted and served almost the entirety of his sentence for the 1992 criminal act.  If counsel had obtained the mental health and criminal records from these time periods, the sequence of events may have been illuminating.  As it is, the court is left to guess.

Would the records have demonstrated grounds for an insanity defense to the kidnapping charge?  Given how exacting that test is after the Hinckley affair, probably not.  Would they have shown a lack of competence?  That is a closer question.  But even setting aside potential defenses and potential obstacles to giving a knowing, intelligent, and voluntary plea, the evidence could certainly have impacted sentencing.  At the very least, it would have put the lie to the government's argument that Mr. Bryant's mental illness was a thing of the distant past.

Many habeas petitioners attempt to raise mental illness in collateral attacks on their convictions.  Most such petitioners submit no evidence of mental illness other than their own bald assertions of such.  Mr. Bryant's case is different.  He has submitted mental health records that document serious mental breaks at key times in his life, including the kidnapping of which he stands convicted.  In addition, the victim herself described Mr. Bryant on the day of the incident as having an unusual look in his eye. And one of the officers described Mr. Bryant being unresponsive to shouted commands, even though Mr. Bryant was surrounded and had no avenue of escape.  This certainly does not suggest a rational mindset.

Given the evidence adduced by Mr. Bryant, and given the procedural posture of this case, the court cannot conclude there is no set of facts by which Mr. Bryant can prove that one or both of his lawyers were ineffective.  If there were red flags which should have induced counsel to investigate Mr. Bryant's mental health records, that could be a failure to perform according to constitutional standards.  The prejudice that might flow from such inactions are that Mr. Bryant may not have been competent to enter a plea or his sentencing may have turned out differently.

The government argues herein that Mr. Bryant was competent to enter a plea because he said he was competent at the change of plea hearing.  This might be an acceptable argument in the normal case where there is no evidence to support a claim of mental illness.  It does not suffice in this case.

First, even if the plea was valid, this does nothing to address prejudice at sentencing—the failure to investigate the mental health history of Mr. Bryant is not just a pre-plea issue.  But, second, if someone is mentally ill and lacks competency, the courts do not rely upon that person's sole testimony in determining competency.  Many incompetent criminal defendants insist on their own competency and resist efforts of their lawyers to establish otherwise. In Mr. Bryant's own medical records, we have evidence that he is not a reliable narrator of his own mental illness.

In a 2007 intake form from Avera, despite being voluntarily hospitalized due to mental status in 1983 and again in 1993, Mr. Bryant told medical care providers he had no prior psychiatric history.  See Docket No. 2-1 at p. 9. Because we have no affidavits from counsel responding to Mr. Bryant's § 2255 claims, we have no idea whether there were facts known to counsel that should have prompted them to investigate this issue.

The government's motion poses the question whether there is any set of facts Mr. Bryant can show that would entitle him to relief.  Given the lack of any evidence from Mr. Bryant's lawyers, and given the concrete evidence Mr. Bryant has presented in support of his claim, the court cannot conclude at this procedural juncture that it would be impossible for Mr. Bryant to prevail. Therefore, the court recommends denying the government's motion to dismiss in its entirety.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends denying the government's motion to dismiss [Docket No. 13].

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 25th day of September, 2020.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge